```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2      _____

 3      United States of America,    )  Criminal Action
                                     )  No. 21-cr-00040-TNM
 4                     Plaintiff,    )
                                     )
 5      vs.                          )  Status Conference
                                     )
 6      Patrick Edward McCaughey,    )
        III, et al.,                 )  Washington, D.C.
 7                                   )  October 4, 2021
                       Defendants.   )  Time:  4:30 p.m.
 8      _____

 9                   Transcript of Status Conference
                               Held Before
10               The Honorable Trevor N. McFadden
                      United States District Judge
11      _____

12                    A P P E A R A N C E S

13      For the Government:      Jocelyn P. Bond
                                 Melissa J. Jackson
14                               Kimberley C. Nielsen
                                 UNITED STATES ATTORNEY'S OFFICE
15                               FOR THE DISTRICT OF COLUMBIA
                                 555 Fourth Street, Northwest
16                               Washington, D.C. 20001

17      For the Defendant (1) Patrick Edward McCaughey, III:
                                 Lindy R. Urso
18                               LINDY R. URSO, ATTORNEY AT LAW
                                 810 Bedford Street, Suite 3
19                               Stamford, Connecticut 06901

20      For the Defendant (2) Tristan Chandler Stevens:
                                 Lauren Cobb
21                               OFFICE OF THE FEDERAL DEFENDER
                                 FOR THE NORTHERN DISTRICT OF FLORIDA
22                               3 West Garden Street, Suite 200
                                 Pensacola, Florida 32502

23
        For the Defendant (3) David Lee Judd:
24                               Elizabeth A. Mullin
                                 OFFICE OF THE FEDERAL PUBLIC DEFENDER
25                               1650 King Street, Suite 500
                                 Alexandria, Virginia 22314
```

```
 1        For the Defendant (4) Christopher Joseph Quaglin:
                                Steven A. Metcalf II
 2                              METCALF & METCALF, P.C.
                                99 Park Avenue, Suite 2501
 3                              New York, New York 10016

 4        For the Defendant (5) Robert Morss:
                                Elizabeth L. Toplin
 5                              Kathleen M. Gaughan
                                FEDERAL COMMUNITY DEFENDER OFFICE,
 6                              EASTERN DISTRICT OF PENNSYLVANIA
                                601 Walnut Street, Suite 540 West
 7                              Philadelphia, Pennsylvania 19106

 8        For the Defendant (6) Geoffrey William Sills:
                                Marc Massey
 9
          For the Defendant (7) David Mehaffie:
10                              Eugene Ohm
                                FEDERAL PUBLIC DEFENDER FOR THE
11                              DISTRICT OF COLUMBIA
                                625 Indiana Avenue, Northwest
12                              Washington, D.C. 20004

13        For the Defendant (8) Steven Cappuccio:
                                Marina T. Douenat
14                              OFFICE OF THE FEDERAL PUBLIC DEFENDER
                                WESTERN DISTRICT OF TEXAS
15                              727 César E. Chávez Boulevard
                                San Antonio, Texas 78206
16
          For the Defendant (9) Federico Guillermo Klein:
17                              Stanley E. Woodward, Jr.
                                BRAND WOODWARD LAW
18                              1808 Park Road, Northwest
                                Washington, D.C. 20010
19
          Also Present:        Masharia Holman, Pretrial Services
20                              Officer
21        _____

          Stenographic Official Court Reporter:
22                              Nancy J. Meyer
                                Registered Diplomate Reporter
23                              Certified Realtime Reporter
                                333 Constitution Avenue, Northwest
24                              Washington, D.C. 20001
                                202-354-3118
25
```

```
 1                      P R O C E E D I N G S

 2            THE COURTROOM DEPUTY:  Your Honor, this is Criminal

 3   Case 21-40.  United States of America v. McCaughey, et al.

 4   From pretrial, Shay Holman.

 5            Counsel, please come forward to identify yourselves for

 6   the record, starting with the government.

 7            MS. JACKSON:  Good afternoon.  AUSA Melissa Jackson

 8   on behalf of the United States of America.

 9            THE COURT:  Good afternoon, Ms. Jackson.

10            MS. NIELSEN:  Good afternoon, Your Honor.  Kimberly

11   Nielsen on behalf of the government.

12            THE COURT:  Good afternoon, Ms. Nielsen.

13            MS. BOND:  Jocelyn Bond on behalf of the United

14   States.

15            THE COURT:  Good afternoon, Ms. Bond.

16            MR. URSO:  Good afternoon, Your Honor.  Lindy Urso of

17   behalf of Mr. McCaughey.

18            THE COURT:  Good afternoon, Mr. Bond [sic].  And

19   where's your client, Mr. -- oh.  Good afternoon, Mr. Urso.

20   Good afternoon, Mr. McCaughey.

21            MS. COBB:  Your Honor, Lauren Cobb.  I'm here for

22   Tristan Stevens, who's present.

23            THE COURT:  Good afternoon, Mr. Stevens.  Good

24   afternoon, Ms. Cobb.

25            MS. COBB:  Thank you.
```

```
 1              MS. MULLIN:  Good afternoon, Your Honor.  Elizabeth
 2    Mullin.  I'm here for David Judd, who is present.
 3              THE COURT:  Good afternoon, Mr. Mullin -- or
 4    Ms. Mullin.  Good afternoon, Mr. Judd.
 5              MR. MASSEY:  Good afternoon, Your Honor.  Marc
 6    Massey, standing in for John Kiyonaga, on behalf of Mr. Sills,
 7    who's present.
 8              THE COURT:  Say that one more time, sir.
 9              MR. MASSEY:  Marc Massey.
10              THE COURT:  Oh, good afternoon, Mr. Massey.
11              MR. MASSEY:  Good afternoon.
12              THE COURT:  And good afternoon, Mr. --
13              MR. MASSEY:  Sills.
14              THE COURT:  -- Sills.
15              MS. TOPLIN:  Good afternoon, Your Honor.  Elizabeth
16    Toplin and Kathleen Gaughan on behalf of Mr. Morss, who's
17    present in the jury box.
18              THE COURT:  Good afternoon, ladies, and good
19    afternoon, Mr. Morss.
20              MR. METCALF:  Good afternoon, Your Honor.  Steven
21    Metcalf on behalf of Joseph McBride.  I'm also on behalf of
22    Christopher Quaglin, who is present.
23              THE COURT:  Okay.  Good afternoon, Mr. Metcalf, and
24    good afternoon --
25              MR. METCALF:  Mr. Quaglin.
```

```
 1                THE COURT:  All right.  I don't have you for -- are
 2       you standing in for someone, Mr. Metcalf?
 3                MR. METCALF:  I'm standing in for Joseph McBride.
 4                THE COURT:  Okay.  Okay.  Thank you, Mr. Metcalf.
 5                MR. METCALF:  Thank you.
 6                THE COURT:  Good afternoon, gentlemen.
 7                MR. OHM:  Eugene Ohm, standing in for Sabrina Shroff,
 8       for David Mehaffie.  Good afternoon, Your Honor.
 9                THE COURT:  Good afternoon, Mr. Ohm, and good
10       afternoon, Mr. Mehaffie.
11                MS. DOUENAT:  Good afternoon, Your Honor.  Marina
12       Douenat on behalf of Mr. Steven Cappuccio.
13                THE COURT:  Good afternoon, Ms. -- Douenat?
14                MS. DOUENAT:  Douenat.  Just like the name Duane and
15       then ah.
16                THE COURT:  Douenat.  Thank you.
17                MS. DOUENAT:  Thank you.
18                THE COURT:  Good afternoon, Ms. Douenat, and good
19       afternoon, Mr. Cappuccio.
20                MR. WOODWARD:  Good afternoon, Your Honor.  Stanley
21       Woodward on behalf of Federico Klein, who is present.
22                THE COURT:  Good afternoon, Mr. Woodward, and good
23       afternoon, Mr. Klein.
24           All right.  Well, that took a while.
25           We order the government to follow its *Brady* obligations
```

1   as we have some new defendants.  Pursuant to the Due Process

2   Protections Act, the Court orders that all government counsel

3   should review their disclosure obligations under *Brady v.*

4   *Maryland* and its progeny as set forth in Local Criminal

5   Rule 5.1 and comply with those provisions.

6          The failure to comply could result in dismissal of the

7   indictment or information, dismissal of individual charges,

8   exclusion of government evidence or witnesses, continuances,

9   bar discipline, or any other remedy that is just under the

10  circumstances.  I'll also be entering a minute order to that

11  effect.

12         All right.  Ms. Jackson, are you speaking for the

13  government?

14              MS. JACKSON:  Yes, Your Honor.

15              THE COURT:  All right.  You've got us all here.  What

16  do you want to do?

17              MS. JACKSON:  Thank you, Your Honor.  From the

18  government's perspective, there are approximately eight issues

19  to deal with.

20         The first being arraignment for -- all the defendants

21  except for Mr. Mehaffie have to be arraigned on the new

22  superseding indictment.

23              THE COURT:  Okay.  Keep going.

24              MS. JACKSON:  The second issue that we're aware of is

25  the -- initial conditions must be set for Mr. Klein in this

1    case.  They were set in his original case.

2         The third issue that we need to deal with is the request

3    for changes in conditions of release that were put forth by

4    various counsel and put forth by pretrial as well.

5         The fourth is the protective order, outstanding motion

6    that we filed to put a protective order in place, specifically

7    as it relates to materials provided to Defendants Mehaffie,

8    Klein, and Cappuccio.

9         The fifth -- although I don't know if we're addressing

10   it now or not -- is the motion by Mr. --

11             THE COURT:  Judd.

12             MS. JACKSON:  I don't know how to pronounce his

13   name -- Kiyonaga to represent Mr. Morss as well as Mr. Sills.

14   The second -- there's not much to do here.  There's a pending

15   motion regarding compelling discovery as it relates to the

16   potential issue of -- or an allegation of selective

17   prosecution.  The government intends to reply -- file a reply

18   to that motion within two weeks.  I don't know if Your Honor

19   wanted to address it further at this point.

20        The seventh, we were going to provide a general update

21   on the status of discovery overall in this particular case and

22   the -- the January 6th case overall.

23        And then the eighth is what we're doing from here and

24   whether or not we're setting a status date or a trial date.

25             THE COURT:  All right.  Why don't we handle those

1      last couple.  Why don't you tell me where those things are as

2      far as you're concerned and what your --

3              MS. JACKSON:  Starting with the discovery issues

4      and -- discovery and where we're at, once the protective order

5      is in place, we will have provided thousands of files for all

6      of the defendants, all these nine defendants, to each other and

7      to their respective counsel, basically compromising --

8      comprising the bulk of all the individualized discovery as it

9      relates to these defendants at this time.

10             We're still working one on one with some defense counsel

11     to provide things like copies of phones, which require hard

12     drives and things like that.

13             As it relates to the broader January 6th cases, the

14     government has filed a repeated series of updates on the status

15     of the discovery outlining how the government has at this

16     point -- is funding and developing two separate databases for

17     the defense to access a variety of materials; first a

18     Relativity platform that we're funding and developing for all

19     the case files, for the other January 6th defendants, tips, and

20     other files we've incorporated into it.

21             And then the second is an evidence.com database which is

22     focused specifically on USCP footage, body-worn camera footage,

23     and other video footages -- video footage that the government

24     has acquired in this very, very large investigation.

25             We've provided more specific updates, but essentially

1   the evidence.com update, which is the videos, is now active, is

2   my understanding, with FPD who is then going to manage handing

3   out the -- I'm not going to use the right word -- user licenses

4   or usernames to all of defense counsel.  That was -- we updated

5   the status of that in the most recent discovery production to

6   defense.

7          My understanding is it now contains many, many, many,

8   many USCP videos, and the body-worn cameras being updated to

9   that as well.  In the meantime, we've separately provided over

10  250 body-worn camera videos that we know are potentially

11  relevant to these particular defense counsel over the past few

12  months.

13         So that's where we're at in terms of the status of the

14  discovery.  Generally, there's also been multiple rolling large

15  productions that we have made both in this case and other

16  January 6th cases of files that defense might view as pertinent

17  to the case, such as IAD -- or internal investigations into

18  USCP officers and the files associated with that; similarly,

19  internal investigation and the weighted use of force

20  investigations and documentation as it relates to MPD officers.

21  Those have already been provided.

22         And we continue to make -- my understanding is that the

23  broader discovery team for the January 6th cases has additional

24  plans for large-scale document productions that are relevant to

25  everybody -- or potentially relevant to everybody, along the

1    same line as we wait for the Relativity platform to be in

2    place.

3         In other words, while we're -- we have a plan to get it

4    all, in the meantime, we're still trying to get more pieces

5    out, as we can.  But that is my general understanding of where

6    we're at in terms of the discovery in this particular case.

7         THE COURT:  So it doesn't sound like you've got any

8    end date or horizon at this point?

9         MS. JACKSON:  I personally don't have any more

10   information than what was provided in the most recent updates;

11   namely, that we're trying to get them online in the next couple

12   weeks for both -- both two different databases and then our

13   filling them up with all the data we can, which, as more

14   defendants come, there's going to be more.  But there's been a

15   huge and monumental effort, both in terms of hiring and

16   spending, to try to get this done and try to get the files into

17   those systems as soon as possible.

18        THE COURT:  Okay.  What are you proposing for next

19   steps, ma'am?

20        MS. JACKSON:  We have offered plea offers out to

21   everyone some months ago, some recently.  I don't know if

22   anybody at this point has -- wants to actually reject that

23   offer on the record or if they're still considering it.  Given

24   that they're still -- we don't know who's going to trial and

25   who's not and then the amount of discovery that is still

1    ongoing, we are asking to set another status 45 days to 60 days

2    out so that we have a more concrete view of the realistic

3    timeline in which defense counsel will have the discovery it

4    needs to prepare for trial, and we know and understand who's

5    actually going to go to trial so that we can book an

6    appropriate amount of time and the appropriate courtroom size.

7              THE COURT:  Right.  Yeah.  We need to -- this is not

8    going to work long-term.

9              MS. JACKSON:  Right.

10             THE COURT:  So we need to figure out either is there

11   going to be a severance or are people pleading out?

12             MS. JACKSON:  Right.  And I just don't think that

13   we're at the point where we can make any of those calls right

14   now, especially with nobody on the record yet rejecting the

15   plea offers that are currently outstanding in this --

16             THE COURT:  Do your plea offers have deadlines?

17             MS. JACKSON:  We had not set a hard deadline because

18   we just did supersede, and out of fairness to them.  Plus,

19   unfortunately with the delay of the protective order getting

20   out, the three newest counsel don't have access to the same

21   stuff that the other folks do.  So they need time to actually

22   look at that.  We would like -- our goal, ideally?  Although

23   we're trying not to be unflexible in this, but our goal is to

24   have that deadline be the next status hearing.  That's why we

25   want it set out far enough in advance people can make a

1    realistic decision and put it on the record at that point.

2            THE COURT:  Okay.  So I'll tell you what I'm inclined

3    to do; come back in 60 days, as -- as you're suggesting, and

4    allow any defendants who wish to waive their presence to do so,

5    assuming they don't have -- there are no probation flags that

6    have been raised in the meantime.  And I hope 60 days from now

7    you're going to be able to give me a better sense of where this

8    is going; and really going to be looking to the government to

9    help kind of organize people in terms of future dates and if

10   we're going to be splitting this or -- or what have you.

11           MS. JACKSON:  Understood, Your Honor.

12           THE COURT:  Does that all make sense to you?

13           MS. JACKSON:  Yes, it does.

14           THE COURT:  Okay.  I'll hear you as to

15   Mr. McCaughey's motion to modify conditions of release.

16           MS. JACKSON:  As it relates to -- frankly,

17   Your Honor, this analysis is very similar both for

18   Mr. McCaughey, Mr. Stevens, and Mr. Judd.  We -- well, let me

19   take that back.

20           The analysis is very similar for Mr. McCaughey and

21   Mr. Judd at this point in time.  Mr. McCaughey and Mr. Judd

22   both have home confinement at the moment.  We would be amenable

23   to a step down, to just GPS, but are asking that the Court

24   maintain at least GPS for these two and for Mr. Stevens at this

25   point.

1      The main -- I understand that they've all been

2  compliant.  We have not had a single issue with them, but we do

3  view GPS as valuable in both ensuring that they're complying

4  with the stay-away that exists in this case from D.C., other

5  than for court appearances or meeting with their counsel, but

6  also as a deterrent to prevent them or convince them not to

7  engage in another violent demonstration like this because

8  they'd know they would be on GPS and, therefore, would -- the

9  government would know if they were there.  We think it does

10  provide a good measure of deterrence and it is working.

11      And it -- it is not such an inconvenience that it

12  actually impedes them from living their life, from going to

13  work, from meeting with people that they need to meet with,

14  going to religious meetings.  It's effective and it's

15  reasonable, and given the very -- very serious charges that

16  they're all facing and the -- the alleged acts that they -- we

17  have alleged that they've committed, we do think that that is

18  appropriate in this particular case.

19      For Mr. Stevens, he was originally set on just GPS

20  monitoring, not home confinement.  But for the same reasons, we

21  do believe that he should maintain and stay on GPS as a

22  requirement for his conditions of release.

23          THE COURT:  So you're -- I think I hear your main

24  concern being they're going to engage in another protest?

25          MS. JACKSON:  Not protest.

1        THE COURT:  Riot?

2        MS. JACKSON:  Violence.  Violent demonstration.  I

3    don't know whether it's -- it could be in the form of a protest

4    or going to a state capitol or state courthouse and taking it a

5    step beyond what is legal and peaceful.

6        THE COURT:  Okay.  So your recommendation is they're

7    free to go where they want, other than the current stay-away,

8    but just leave them on GPS?

9        MS. JACKSON:  Yes, Your Honor.

10        THE COURT:  So that's for McCaughey, Mr. Judd, and

11    Mr. Stevens?

12        MS. JACKSON:  Yes, Your Honor.

13        THE COURT:  Okay.  For Mr. Klein, I take it you're

14    comfortable with the conditions of release in his prior case?

15        MS. JACKSON:  Can I call for -- if you don't mind,

16    bring in my co-counsel?

17        THE COURT:  Phone a friend?

18        MS. JACKSON:  Yes.

19        MS. BOND:  Thank you, Your Honor.

20        With respect to Mr. Klein, the government is actually

21    supporting pretrial's request to remove him from supervision

22    and have him stepped back.  This is the fourth pretrial report

23    that they have filed where they're asking for some sort of

24    sanction because Mr. Klein has repeatedly been unwilling to

25    work with pretrial to abide by conditions.  So we are

1    requesting -- we fully support pretrial's request here.  And I

2    can go into more detail if Your Honor would like.

3        One issue with respect to Mr. Klein is Judge Bates did

4    set the conditions of release in the 236 case, and we've all

5    been operating under the assumption that those conditions

6    continue to carry through, but I'm informed by pretrial that

7    they're not actually able to file any reports in 21-cr-40.  So

8    we're asking Your Honor to set -- set conditions and address

9    the issues in this particular case so that the conditions

10   are -- from the prior case carry over and then we address the

11   pretrial violations that have been filed in the 236 case.

12           THE COURT:  Does Mr. Klein have any priors?

13           MS. BOND:  Your Honor, no, he does not.

14           THE COURT:  Okay.

15           MS. BOND:  He was originally detained by the

16   magistrate judge, and then Judge Bates reviewed that and

17   released him in April.  He was on home detention.  And after

18   the first two violations -- the first two, pretrial requested

19   that he be placed on home incarceration, which is a higher

20   level of home confinement.  But now they are requesting

21   complete removal.

22           THE COURT:  So why wouldn't home detention work here?

23           MS. BOND:  I'm sorry?

24           THE COURT:  Why don't you think home detention is

25   appropriate?

1          MS. BOND:  We're actually asking for --

2          THE COURT:  I know you're asking for him to be

3    stepped back.  I'm asking why -- I mean, it seems like he likes

4    to go to the beach.

5          MS. BOND:  So we don't think home detention is

6    appropriate, and we don't think home incarceration is

7    appropriate anymore.  If Your Honor is not inclined to remove

8    him and have him stepped back, then we do think that the

9    increased home incarceration as opposed to home confinement is

10   appropriate.

11         He does seem to like to blow off pretrial.  He likes to

12   stop at Chipotle on the way to his drug analysis.  He likes to

13   go to his mother's house and get drunk there, such that he

14   can't come home in time.  He likes to not report to pretrial

15   when he's supposed to be reporting to pretrial.

16         All of those are indicative of what we argued to

17   Judge Bates months ago; that he is unwilling to comply with

18   conditions of release.  And I think the last six months have

19   really borne that out; that he blows them off.  He doesn't take

20   it seriously.  He doesn't think that it applies to him; that

21   somehow he is above this process.  And that's the pattern that

22   we have seen.

23         THE COURT:  Remind me, what's the difference between

24   home incarceration and home detention?

25         MS. BOND:  Your Honor, pretrial described it as -- so

1    his home detention, he is restricted to his residence at all

2    times except for employment, education, religious services,

3    medical, substance abuse or mental health treatment, attorney

4    visits, court appearances, court-ordered obligations, or other

5    activities approved in advance by pretrial.  So it's pretty

6    open.  He's allowed to do a lot of things.

7         Home incarceration, which would be the next step, he's

8    restricted to a 24-hour-a-day lockdown at his residence, except

9    for medical necessities and court appearances or other

10   activities specifically approved by the Court.

11        THE COURT:  Okay.  Thank you, ma'am.

12        Do you have a position on Mr. Morss's motion to

13   substitute counsel or does --

14        MS. BOND:  I will ask Ms. Jackson to speak to that.

15        THE COURT:  Okay.

16        MS. JACKSON:  Before I do, Your Honor, the --

17   Ms. Bond is actually best able to also speak to

18   Mr. Mehaffie's -- pretrial's concerns regarding Mr. Mehaffie

19   before we switch.

20        THE COURT:  Okay.  Okay.

21        MS. JACKSON:  We wanted to deal with that issue

22   first.

23        THE COURT:  Sure.  That's fine.  Oh.  Maybe

24   Mr. Mehaffie is the one who's going in the water.  I think I'm

25   getting my --

1          MS. BOND:  So with respect to Mr. Mehaffie, we have a

2     different view than we have with respect to Mr. Klein.  We are

3     not asking that he be removed from supervision.  We defer to

4     pretrial, if they have some sort of lesser sanction that they

5     recommend imposing.

6          Mr. Mehaffie does not have a criminal history, and this

7     is his first violation of pretrial.  We ask that he be

8     admonished and the Court consider a sanction, but we don't

9     think that removal is appropriate at this time.

10          THE COURT:  Okay.  All right.  Give me just a moment.

11          THE COURT REPORTER:  Where is that beeping coming

12     from?

13          THE COURT:  Does somebody have a phone on?

14          THE PRETRIAL SERVICES OFFICER:  Your Honor, it's a

15     GPS ankle monitor beeping.

16          THE COURT:  Okay.  Got it.  Can't do much about that.

17          All right.  Yes, ma'am.  You were going to talk about

18     Mr. Morss.

19          MS. BOND:  Ms. Jackson is going to talk about

20     Mr. Morss.

21          THE COURT:  Okay.

22          MS. JACKSON:  So as it also relates to Mr. Morss,

23     I -- when Mr. Kiyonaga called to let us know that he was hired

24     by Mr. Morss, I raised the one concern the government has;

25     mainly, a potential conflict between Morss -- his

1    representation of Mr. Morss and Mr. Sills.

2         The most obvious conflict that comes to mind is in his

3    position as defense counsel for either party, he -- the

4    government thinks it's inevitable that he's going to have to

5    compare and contrast both the evidence available for each and

6    the culpability of each in terms of arguments both to the jury

7    or arguments and sentencing before Your Honor.

8         And that raises some concern.  I don't -- it just raises

9    some concern because that does seem to be an obvious conflict

10   in this particular case.  It would be different if they weren't

11   joined in one group, but because they are, we are -- we do have

12   some concerns about that.  At the time he said he was going to

13   think about it, but he thought it was waivable.  And I just

14   wanted to make sure that it was addressed before Your Honor and

15   then would leave it up to Your Honor in terms of next steps

16   regarding what would occur.

17        THE COURT:  Okay.  Thank you.

18        All right.  Ms. Chaclan, can we go ahead and arraign the

19   defendants.

20        THE COURTROOM DEPUTY:  Mr. McCaughey, if you could

21   come forward with your attorney.  This will be addressed to

22   you, but, Mr. Urso, you can answer for him.

23        Patrick Edward McCaughey, III, in Criminal Case 21-40 in

24   which you are charged by an indictment on Count 14, assaulting,

25   resisting, or impeding certain officers and aiding and

1    abetting; Counts 24 and 25, assaulting, resisting, or impeding

2    officers using a dangerous weapon; Count 34, obstruction of an

3    official proceeding and aiding and abetting; Count 35, civil

4    disorder; Count 37, disorderly and disruptive conduct in a

5    restricted building or grounds with a deadly or dangerous

6    weapon; Count 45, engaging in physical violence in a restricted

7    building or grounds with a deadly or dangerous weapon; Count

8    52, disorderly conduct in a Capitol Building; Count 53, act of

9    physical violence in a Capitol grounds or buildings, do you

10   waive the formal reading of the superseding indictment, and how

11   do you wish to plead?

12             DEFENDANT MCCAUGHEY:  I agree to waive the formal

13   reading, and I enter a plea of not guilty.

14             THE COURTROOM DEPUTY:  Thank you.  You may be seated.

15        Mr. Stevens, along with your attorney.

16             THE COURT:  All right.  I think we can have the

17   attorneys respond on the defendants' behalf.

18             THE COURTROOM DEPUTY:  Tristan Chandler Stevens, in

19   Criminal Case 21-40 in which you're charged by an indictment on

20   Counts 14, 16, and 33, assaulting, resisting, or impeding

21   certain officers and aiding and abetting; Count 21, assaulting,

22   resisting, or impeding certain officers using a dangerous

23   weapon; Count 34, obstruction of an official proceeding and

24   aiding and abetting; Count 35, civil disorder; Count 36,

25   disorderly and disruptive conduct in a restricted building or

1   grounds with a deadly or dangerous weapon; Count 44, engaging

2   in physical violence in a restricted building or grounds with a

3   deadly or dangerous weapon; Count 52, disorderly conduct in a

4   Capitol Building; Count 53, act of physical violence in a

5   Capitol grounds or buildings, do you waive the formal reading

6   of the superseding indictment, and how do you wish to plead?

7         MS. COBB:  He'll waive the formal reading and plead

8   not guilty on all counts.

9         THE COURTROOM DEPUTY:  Thank you.

10         Mr. Judd, with your attorney, please.

11         David Lee Judd, in Criminal Case 21-40 in which you're

12   charged by an indictment on Counts 16 and 33, assaulting,

13   resisting, or impeding certain officers and aiding and

14   abetting; Count 22, assaulting, resisting, or impeding certain

15   officers using a dangerous weapon; Count 34, obstruction of an

16   official proceeding and aiding and abetting; Count 35, civil

17   disorder; Count 38, disorderly and disruptive conduct in a

18   restricted building or grounds with a deadly or dangerous

19   weapon; Count 46, engaging in physical violence in a restricted

20   building or grounds with a deadly or dangerous weapon; Count

21   52, disorderly conduct in a Capitol Building; Count 53, act of

22   physical violence in a Capitol building or grounds, do you

23   waive the formal reading of the superseding indictment, and how

24   do you wish to plead?

25         MS. MULLIN:  On behalf of Mr. Judd, Mr. Judd waives a

1    further formal reading and enters a plea of not guilty.

2              THE COURTROOM DEPUTY:  Thank you.

3         Mr. Christopher Quaglin.

4         Christopher Joseph Quaglin, in Criminal Case 21-40 in

5    which you're charged by an indictment on Counts 1 and 3,

6    assaulting, resisting, or impeding certain officers; Count 2,

7    inflicting bodily injury or certain officers -- on certain

8    officers; Counts 4 and 20, robbery and aiding and abetting;

9    Count 11, assaulting, resisting, or impeding certain officers

10   and aiding and abetting; Counts 23 and 26, assaulting,

11   resisting, or impeding certain officers using a dangerous

12   weapon; Count 34, obstruction of an initial proceeding and

13   aiding and abetting; Count 35, civil disorder; Count 39,

14   disorderly and disruptive conduct in a restricted building or

15   grounds with a deadly or dangerous weapon; Count 47, engaging

16   in physical violence in a restricted building or grounds with a

17   deadly or dangerous weapon; Count 52, disorderly conduct in a

18   Capitol Building; Count 53, act of physical violence in a

19   Capitol grounds or building, do you waive the formal reading of

20   the superseding indictment, and how do you wish to plead?

21             MR. METCALF:  We waive a formal reading and enter a

22   plea of not guilty on all counts.

23             THE COURTROOM DEPUTY:  Thank you.

24             MR. METCALF:  Thank you.

25             THE COURTROOM DEPUTY:  Mr. Robert Morss.

1          Robert Morss, Criminal Case 21-40 in which you're

2     charged by an indictment on Counts 5 and 20, robbery; Count 6,

3     robbery and aiding and abetting; Counts 10 and 27, assaulting,

4     resisting, or impeding certain officers and aiding and

5     abetting; Count 34, obstruction of an official proceeding and

6     aiding and abetting; Count 35, civil disorder; Count 41,

7     disorderly and disruptive conduct in a restricted building or

8     grounds with a deadly or dangerous weapon; Count 49, engaging

9     in physical violence in a restricted building or grounds with a

10    deadly or dangerous weapon; Count 52, disorderly conduct in a

11    Capitol Building; Count 53, act of physical violence in a

12    Capitol grounds or buildings, do you waive a formal reading of

13    the superseding indictment, and how do you wish to plead?

14          MS. TOPLIN:  On behalf of Mr. Morss, we do waive

15    formal reading and ask that the plea of not guilty be entered.

16          THE COURTROOM DEPUTY:  Thank you.

17      Mr. Geoffrey Sills.

18          Geoffrey William Sills, in Criminal Case 21-40 in which

19    you're charged by an indictment on Counts 7, 8, 15, and 18,

20    assaulting, resisting, or impeding certain officers using a

21    dangerous weapon; Count 13, robbery and aiding and abetting;

22    Count 34, obstruction of an official proceeding and aiding and

23    abetting; Count 35, civil disorder; Count 40, disorderly and

24    disruptive conduct in a restricted building or grounds with a

25    deadly or dangerous weapon; Count 48, engaging in physical

1     violence in a restricted building or grounds with a deadly or

2     dangerous weapon; Count 52, disorderly conduct in a Capitol

3     Building; Count 53, act of physical violence in a Capitol

4     grounds or buildings, do you waive the formal reading of the

5     superseding indictment, and how do you wish to plead?

6          MR. METCALF:  We waive formal reading and enter a

7     plea of not guilty.

8          THE COURTROOM DEPUTY:  Thank you.

9        Mr. Steven Cappuccio.

10         Steven Cappuccio, in Criminal Case 21-40 in which you're

11    charged by an indictment on Count 28, assaulting, resisting, or

12    impeding certain officers and aiding and abetting; Count 29,

13    assaulting, resisting, or impeding certain officers using a

14    dangerous weapon; Count 30, robbery and aiding and abetting;

15    Count 34, obstruction of an official proceeding and aiding and

16    abetting; Count 35, civil disorder; Count 42, disorderly and

17    disruptive conduct in a restricted building or grounds with a

18    deadly or dangerous weapon; Count 50, engaging in physical

19    violence in a restricted building or grounds with a deadly or

20    dangerous weapon; Count 52, disorderly conduct in a Capitol

21    Building; Count 53, act of physical violence in a Capitol

22    grounds or buildings, do you waive the formal reading of the

23    superseding indictment, and how do you wish to plead.

24         MS. DOUENAT:  Yes.  On behalf of Mr. Steven

25    Cappuccio, he waives the formal reading of the indictment and

1    he pleads not guilty to all counts.

2              THE COURTROOM DEPUTY:  Thank you.

3         And Mr. Klein.

4         Federico Guillermo Klein, in Criminal Case 21-40 in

5    which you're charged by an indictment on Counts 9, 17, 19, and

6    27, assaulting, resisting, or impeding certain officers and

7    aiding and abetting; Counts 31 and 32, assaulting and resisting

8    or impeding certain officers using a dangerous weapon;

9    Count 34, obstruction of an official proceeding, aiding and

10   abetting; Count 35, civil disorder; Count 43, disorderly and

11   disruptive conduct in a restricted building or grounds with a

12   deadly or dangerous weapon; Count 51, engaging in physical

13   violence in a restricted building or grounds with a deadly or

14   dangerous weapon; Count 52, disorderly conduct in a Capitol

15   Building, and Count 53, act of physical violence in a Capitol

16   grounds or buildings, do you waive the formal reading of the

17   superseding indictment, and how do you wish to plead?

18             DEFENDANT KLEIN:  I wish to waive all formal -- all

19   formal reading and enter a plea of not guilty.

20             THE COURTROOM DEPUTY:  Thank you.

21             THE COURT:  All right.  Thanks, folks.  You may be

22   seated.

23        All right.  Mr. Urso, I'll hear from you.  I want to

24   discuss 60 days.

25        I imagine the government is seeking to toll the time in

1     the next 60 days?

2               MS. JACKSON:  Yes.

3               THE COURT:  All right.  Let me know what you think

4     about that.

5               MR. URSO:  Sixty days works, Your Honor.  I think

6     that makes sense.  We agree to tolling.  No problem with that.

7               THE COURT:  What do you think about the GPS

8     monitoring?

9               MR. URSO:  Your Honor, just for the record, I

10    indicated to the government on the way out, Mr. McCaughey

11    actually started on home confinement and has since been -- he

12    was already previously dropped down to GPS.  So he's been on

13    GPS now a couple months.  He's been supervised -- I think it

14    was by agreement last time.  They knocked it down from home

15    confinement to GPS.  So he's been on GPS alone since, I think,

16    the last status or maybe before that.  So right now, he's just

17    got the GPS.

18         And this -- this motion, Your Honor, frankly, was

19    brought at the behest of his senior pretrial services officer

20    who's supervising him.  He asked me to suggest that I file a

21    motion.  In fact, he reached out this morning to Mr. McCaughey

22    to confirm that this is on the calendar.  This is really --

23    he's pushing this.  Obviously we're -- we're asking for it as

24    well.

25         I understand the government's blanket position on, sort

1     of, GPS, but it's not without its limitations or problems for

2     the defendant.  For instance, he can't wear his work boots.  He

3     can't work on his unfinished basement in his house because it

4     goes out of range.  The unit is in the main level.  He has to

5     be home if he's working late.  He's got to get home to charge

6     it within 12 hours.  So it's not without important

7     inconveniences.

8                   THE COURT:  How is your client employed, sir?

9                   MR. URSO:  He works full-time for his father's

10    construction company, Your Honor, McCaughey Construction.  And

11    as -- as I indicated in my motion and in the pretrial services

12    email, he's been a model -- model client from day one.  I mean,

13    he's just been a perfect client.

14          And, again, this is really being pushed by his

15    supervising officer, and -- and he is a senior pretrial

16    services officer up in Connecticut.  So I assume he's dealt

17    with, you know, hundreds or thousands of clients like this.

18    And, you know, I see that the government has deferred to

19    pretrial services on other matters in the opposite direction;

20    at least one I heard this morning.

21          I just think that's why we have these pretrial services

22    officers because they're the ones hands-on, they know what the

23    client requires regarding supervision.  And obviously before

24    January 6th he had a spotless record.  Your Honor may or may

25    not recall, he had a lot of letters, and he's been spotless

1    since.  And it's -- it's just -- honestly, just not necessary.

2    And I agree with the pretrial services officer, and I'd ask the

3    Court to -- to modify it.

4              THE COURT:  Okay.  Do we have someone here from

5    pretrial services?

6              THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

7              THE COURT:  Great.  Thank you.

8         Mr. Urso, anything else you wanted to discuss?

9              MR. URSO:  No, Your Honor.  In -- in terms of the --

10   the delay, I mean, I can tell the Court just -- it takes me

11   upwards of a day just to download some of these discovery

12   batches we get.  So I'm completely in agreement with pushing

13   this back.

14             THE COURT:  Okay.  Thank you.

15             THE PRETRIAL SERVICES OFFICER:  Your Honor, Shay

16   Holman, pretrial services.

17        First, let me address the issue.  Pretrial has had

18   issues with other jurisdictions.  Pretrial absorbed the first

19   400 cases from the riot cases, and then in April we started

20   asking for courtesy supervision.  So we've had an issue with

21   other jurisdictions speaking to attorneys and not keeping us in

22   the loop.  And that's what happened in this case.

23        I will say that the supervising officer in the

24   jurisdiction emailed me about two weeks ago.  And when I asked

25   for compliance, he was compliant, and that he recommended

1   stepping down -- removing location monitoring.  I told him at

2   that time pretrial does not make that recommendation.  If the

3   attorney files a motion, then we will give our opinion, and I

4   left it at that.  I did not know until defense counsel just

5   made representations that the officer contacted him.  So that

6   is the issue that I will address with him.

7        That being said, he has remained compliant, and I did

8   confirm earlier this afternoon that he is on GPS.  So he was

9   stepped down from home confinement to GPS.

10       So I just want to make the record clear that when

11  defense counsel is stating pretrial, he's speaking in reference

12  to the other jurisdiction, and we've tried to explain to them

13  that D.C. pretrial is the one that has to come before the Court

14  and make -- and make the recommendation.

15       So with that being said, he has been compliant.  So we

16  will defer to the Court.

17            THE COURT:  Any thoughts on the -- concern about the

18  boots, whether -- have you heard about that before?

19            THE PRETRIAL SERVICES OFFICER:  That's an ongoing

20  issue that we have with defendants in general, Your Honor.  If

21  they wear the work boots that come up a little higher, the GPS

22  devices can be a little bulky and they're hard to -- for them

23  to securely close their work boots all the way.  They have to,

24  kind of, leave them untied so -- because the GPS can be about

25  this thick, and it doesn't fit comfortably.  So that's the

```
 1    issue we've had for years.
 2              THE COURT:  Okay.  I'm granting Mr. McCaughey's
 3    motion.  Do you need me to sign anything, ma'am?  All other
 4    conditions will remain in place.
 5              THE PRETRIAL SERVICES OFFICER:  Just the minute
 6    order, Your Honor, that you're -- so you're taking him off of
 7    location monitoring?
 8              THE COURT:  Correct.
 9              THE PRETRIAL SERVICES OFFICER:  Okay.
10              THE COURT:  Okay thank you, yes, ma'am.
11         Ms. Cobb, same questions.
12              MS. COBB:  Okay.  As to the 60 days, we also do not
13    object.  We're --
14              THE COURT:  Do you agree -- you agreed to waive
15    tolling -- or to toll?
16              MS. COBB:  Yes, we agree to the tolling.
17              THE COURT:  So, Mr. Urso, you agree as well?
18              MR. URSO:  Yes, I agree.
19              THE COURT:  Okay.  Thank you.
20              MS. COBB:  So that's not an issue for us.  We're
21    having the same issues with just it takes time to download, not
22    to mention watch all of the discovery we've been provided.
23         As for our motion to modify Mr. Stevens' conditions,
24    it's based on time, for the most part.  Mr. Stevens has been on
25    pretrial release longer than any of the other defendants in
```

1    this case.  He was released on February 10th.  So next week

2    it'll be eight months that he has been on a GPS monitor.  He

3    has during that eight months showed that he does respect the

4    conditions, respects the Court.  He has not had one issue.

5         I check in with his pretrial services officer in the

6    Northern District of Florida on a regular basis, and nothing

7    has ever come up.  He is every -- you know, every condition,

8    everything he's asked to do, he's doing it.  And so our

9    request, Your Honor, is just that -- certainly we understand

10   when he was initially put on pretrial supervision, the Court

11   didn't know how it would go, didn't know if they could trust

12   Mr. Stevens.

13        But here we are.  We have eight months of him completely

14   complying and showing that he does respect the Court and that

15   he will follow the conditions.  And so it's our position at

16   this point eight months in for him that GPS is greater than

17   necessary to -- to ensure the safety of the community, to

18   ensure that he'll come to court.  So that's why we're asking

19   you to remove it.

20             THE COURT:  All right.  Anything else for

21   Mr. Stevens, ma'am?

22             MS. COBB:  No, Your Honor.  I think that's it.

23             THE COURT:  Mr. Stevens' motion is denied.

24        Mr. Massey.

25             I should say, ma'am, that's without prejudice to you

1    re-raising it later, but at this point I think it's

2    appropriate.

3             Mr. Massey.

4             MR. MASSEY:  Good morning, Your Honor.

5             THE COURT:  Good afternoon.

6             MR. MASSEY:  Good afternoon.  True.

7        I guess we have John's motion -- Mr. Kiyonaga's motion

8    to substitute.

9             THE COURT:  Yeah, I'm not sure that I can handle that

10   right now.  I'm kind of concerned he's not here.  How do you --

11            MR. MASSEY:  I -- I understand he's returning to

12   the -- returning tonight.  So if the Court would like, I'm sure

13   he can do a remote conference or remote session this week,

14   whatever -- whatever is best for the Court.  Today was just the

15   odd bad day out.

16            THE COURT:  Yeah.  Have you-all talked about how we

17   should assure ourselves that both defendants are going to be

18   adequately --

19            MR. MASSEY:  Yeah.  I think Mr. Kiyonaga's view is

20   that this is a unique indictment, which I think the Court

21   recognized just by scale, and Mr. Sills and Mr. Morss are

22   not -- their interests aren't adverse, and it's hard to see how

23   they would ever end up adverse.

24            THE COURT:  Well, I can certainly imagine -- I mean,

25   sentencing, if nothing else.  Might not come to sentencing, but

1    I'm sure every defense counsel is going to want to be able to

2    argue that his client is the least worst and don't -- don't

3    compare them to our -- contrast them to all these other baddies

4    out there.

5              MR. MASSEY:  Perhaps.  But Mr. Morss and Mr. Sills,

6    they don't know each other.  The indictment doesn't allege

7    either collaboration or conspiracy.  The indictment doesn't

8    even allege, like, a common collaborator in that Mr. Sills

9    didn't collaborate allegedly with -- with individual X who also

10   collaborated with individual -- with -- sorry -- with

11   Mr. Morss.

12             So I think it's just by virtue of this unique

13   circumstance that joined them in the matter that they wouldn't

14   otherwise be joined in, and I think that's Mr. Kiyonaga's view.

15   And Mr. Kiyonaga spoke with both -- both defendants and

16   explained the issue, explained their ability to have an

17   attorney who doesn't represent another co-defendant and

18   explained that based on the circumstances of this case, there

19   could conceivably be an instance where -- I don't even want to

20   say that because I'm not entirely sure how --

21             THE COURT:  All right.  Let's -- why don't we do that

22   in another hearing.

23             MR. MASSEY:  Sure.

24             THE COURT:  Mr. Kiyonaga and, I guess -- remind me,

25   are you his current counsel of record?  Or who is the current

```
 1        counsel of record?
 2                MR. MASSEY:  Mr. Kiyonaga is current counsel for
 3        Mr. Sills.
 4                THE COURT:  Okay.  So counsel of record for
 5        Mr. Morss?
 6                MR. MASSEY:  Ms. Toplin.
 7                THE COURT:  Ah.  Thank you.  And so Mr. Kiyonaga
 8        is -- Mr. Morss is looking to hire Mr. Kiyonaga.  Is that
 9        correct, ma'am?
10                MS. TOPLIN:  That is correct.  I discussed it at
11        great length with Mr. Kiyonaga.
12                THE COURT:  Okay.  So I think when we get to
13        Mr. Morss, we should set another hearing for that purpose.  I
14        don't know that Mr. Kiyonaga is -- do you think
15        Mr. Quaglin [sic] should appear as well?
16                MR. MASSEY:  No.  I'm not sure why.  I don't believe
17        so, no.
18                THE COURT:  Okay.  Anything else that you want to
19        address, sir?
20                MR. MASSEY:  No.  I believe that's it, Your Honor.
21                THE COURT:  Okay.  And on behalf of Mr. Quaglin, are
22        you comfortable -- you are representing Mr. Quaglin?
23                MR. MASSEY:  Mr. Sills.
24                THE COURT:  I'm sorry.  Mr. Sills.
25                MR. MASSEY:  I'm standing in for John, Mr. Kiyonaga.
```

1          No, Mr. Sills is detained.  So we -- we do not think a

2     60-day tolling period is appropriate.  I understand the

3     government's issues, but 60 days is a long time for a detained

4     defendant.

5               THE COURT:  Okay.  Anything else --

6               MR. MASSEY:  No, Your Honor.

7               THE COURT:  -- you wanted to raise on behalf of

8     Mr. Sills?

9               MR. MASSEY:  No, Your Honor.

10               THE COURT:  Okay.  Thank you.

11          Mr. Metcalf, you're representing Mr. Quaglin -- sorry

12     about that.  You're standing in for Mr. McBride?

13               MR. METCALF:  That's correct.

14               THE COURT:  Okay.  What does Mr. Quaglin say to a

15     60-day continuance, speedy trial tolling?

16               MR. METCALF:  We have no objections, and we'll agree

17     to tolling for the 60 days, especially in light of how long it

18     takes for the discovery material to get to Mr. Quaglin and his

19     recent transfer to the D.C. jail and the wait list that goes

20     along with him receiving the discovery.  So we have no

21     objection to tolling 60 days, Your Honor.

22               THE COURT:  Okay.  Anything else you wish to address

23     on behalf of Mr. Quaglin.

24               MR. METCALF:  Just one issue, Your Honor -- and it's

25     more for the record and for Your Honor's attention -- is that

1    Mr. Quaglin's medical attention has become a serious concern of

2    Attorney McBride.  He has an autoimmune disease where he has to

3    abide by a very strict diet.  Those diet limitations and --

4    have not been abided by since he's been basically in D.C. jail.

5         So for the last 14 days he's been quarantined and is not

6    being given the food that can comply with such dietary

7    restrictions, and it has left him in a substantial state, a

8    weakened state.  And in doing that, he's had to file numerous

9    grievances, to the tune of, I believe, 14 in the last two

10   weeks.  And, more recently, his pens were actually taken way so

11   he does not have the ability now so he can fill out these

12   grievances.

13        I asked the marshals today if I could give -- give a

14   handful of ballpoint pens for Mr. Quaglin to be able to use.

15   That request was obviously denied, but this is just something

16   we'd like to bring to the Court's attention and Attorney

17   McBride will feel, if necessary, to bring this forward on a

18   bail modification application, if he so chooses to do so.

19             THE COURT:  Have you-all talked with the marshals

20   service about that?

21             MR. METCALF:  As far as his dietary --

22             THE COURT:  The medical.

23             MR. METCALF:  -- restrictions?  I believe

24   Attorney McBride has.  I have not been privy to those

25   conversations.

 1            THE COURT:  Okay.  If he hasn't, why don't you

 2    encourage him to reach out to the marshals service.  They might

 3    be able to help.

 4            MR. METCALF:  Absolutely.

 5            THE COURT:  Thank you, Mr. Metcalf.

 6        Ms. Mullin, I believe I skipped over you.  I'm sorry

 7    about that.

 8            MS. MULLIN:  Good afternoon.  On behalf of David

 9    Judd, with respect to the 60 days, we have no objection to a

10    continuance and waiving speedy trial, tolling the speedy trial.

11    He would like to waive his presence at the next status hearing.

12    He's qualified for court-appointed counsel, and the ticket to

13    get out here was quite expensive.

14        So if the Court would either -- I can file a written

15    waiver or if the Court would colloquy him today, he'd like to

16    waive his presence at the next status hearing.

17        Other than that, we have no objection.

18            THE COURT:  That's -- I'm fine with that, assuming

19    that there are no pretrial supervision issues that have been

20    raised by probation in the meantime.

21            MS. MULLIN:  Okay.  Would the Court like a written

22    waiver prior to the hearing?

23            THE COURT:  Yes, please.

24            MS. MULLIN:  Thank you.

25        With respect to our motion to modify conditions of

1   release, Your Honor, Mr. Judd has been on home detention and

2   GPS since May.  He has no prior convictions.  He's been in

3   complete compliance.

4        And I hope we don't run into the same communication

5   issue, but I also spoke with his pretrial officer, Fred Forman,

6   and provided Mr. Forman's number to government counsel and to

7   chambers.  And I don't know if he talked to pretrial services

8   here in D.C.  I hope that we don't have that issue here.  But

9   Mr. Forman did represent that he does not think that Mr. Judd

10  needs to be on GPS monitoring anymore or home detention

11  anymore, and he -- he is -- he did request through me that it

12  be removed.  I don't know if the government or chambers had an

13  opportunity to speak with him as well, but he's amenable to

14  speaking to both government counsel and -- and chambers.

15       With respect to the government's argument that GPS would

16  somehow deter him if he wanted to go to another protest or

17  something like that, the government has already acknowledged he

18  should be free to go where he wants.  I don't think the

19  addition of GPS monitoring would deter him from engaging in

20  violence.  I think the deterrent is the fear of rearrest.

21  Also, he has no history of violence.

22       In this case, he is not accused of or alleged to have

23  injured anybody.  He's alleged to have tossed a small -- what

24  appears to be a small sparkler, but that did not detonate.  It

25  did not injure anyone.  He's not accused of striking anyone.

1   He's not accused of being any part of any fringe violent

2   organization.  He's not accused of expressing any violent

3   messages on social media.  So he really has a spotless record

4   but for this one alleged incident at the January 6th protest.

5          He is employed at two jobs.  He's working at a retail

6   store, and he also works for the Dallas Cowboys in the stadium.

7   Attends church.  That was one issue we had prior because his

8   church fell outside the jurisdiction, so Court allowed his

9   jurisdiction to be expanded.  And so there's really no concern

10  here that -- there's really no need for GPS monitoring anymore,

11  and his pretrial officer concurs with that assessment.

12          THE COURT:  Is there -- is there a specific hindrance

13  that is --

14          MS. MULLIN:  Yes, Your Honor.  There are three areas

15  in his home and outside of his home where the GPS doesn't work.

16  And so he's not able to help do some yardwork because there are

17  areas of his yard where the GPS goes out.  And they're

18  rebuilding -- he lives which his mother and grandmother and

19  they're rebuilding parts of the home, and so he's not able to

20  assist with some of that work because the GPS doesn't work in

21  those zones, so to speak.  And so that's, you know, created a

22  problem for him.

23          And same with the other defendant, you know, he works

24  two jobs, and he does have to rush home if the GPS is going to

25  be -- to charge his GPS.  So sometimes it creates an impediment

1    there, but -- but those are the main issues; but, mostly,

2    Your Honor, it's just that the pretrial officer doesn't think

3    it's necessary anymore.

4         THE COURT:  Okay.  Thank you, ma'am.

5         Are you going to -- so I'm going to give the government

6    two weeks to respond to your motion.  I'll ask the government

7    to respond to your motion to compel by October 18.  If you're

8    going to file a reply, I'll ask you to do that by October 25th.

9         I'll say -- I mean, it -- it strikes me that a selective

10   prosecution argument is certainly plausible here.  Obviously

11   that's a very high standard, and I'm a little skeptical about

12   trolling through U.S. attorney emails in other jurisdictions.

13   So I haven't focused on your motion, but I'd be very interested

14   if you have prior examples of where -- what you're asking here

15   has been allowed.  So you might focus in on that in your reply,

16   if you haven't already done so.

17        All right.  Thank you, ma'am.

18        Can I have pretrial speak to the GPS issue.

19        THE PRETRIAL SERVICES OFFICER:  Your Honor, with

20   reference to Mr. Judd, the report does indicate that he has

21   been compliant.

22        I will address the issue defense counsel raised with

23   reference to the GPS not working in certain areas.  So he is on

24   home confinement.  So that is considered the four walls of your

25   home.  So that's why it's set up for that.  So going out into

1   the yard or taking the trash out, all of that is not -- not

2   permitted.

3           But other than that, the report indicates that he has

4   been compliant with location monitoring and other conditions of

5   release.  So we would defer to the Court.

6           THE COURT:  Okay.  He's current -- I thought he was

7   just on GPS monitoring, but he's actually on home confinement

8   right now?

9           THE PRETRIAL SERVICES OFFICER:  Right.

10          THE COURT:  Okay.

11          THE PRETRIAL SERVICES OFFICER:  Based on the report I

12  have in front of me, he's on home confinement.

13          THE COURT:  All right.  Ms. Mullin, that's your

14  understanding as well?

15          MS. MULLIN:  Yes.  He's permitted to work.

16          THE COURT:  Okay.  I am granting the motion to modify

17  insofar as he will be removed from home confinement.  He will

18  remain on GPS monitoring.  All other conditions will remain the

19  same.

20          THE PRETRIAL SERVICES OFFICER:  Your Honor, is that

21  GPS only or GPS with a curfew?

22          THE COURT:  GPS only.

23          THE PRETRIAL SERVICES OFFICER:  GPS only.  Okay.

24          THE COURT:  Okay.  Thank you, ma'am.

25          Ms. Toplin.

1      MS. TOPLIN:  Your Honor, in terms of the 60-day date,

2  I'm inclined on behalf of Mr. Morss not to object because of

3  Mr. Morss's application for substitute counsel.  Mr. Morss,

4  however, has been incarcerated since June.

5      The -- there are vast amounts of discovery that are

6  coming in regularly.  We've heard about the two discovery

7  platforms that are supposed to be up and running so we can

8  access the discovery more easily; however, we don't have any

9  time frame as to when that may occur.  So I'm wondering if the

10  Court is going to consider a discovery deadline or a date by

11  which at least we could have some clarity as to maybe when -- I

12  mean, I recognize *Jencks* and things like that may come much

13  closer to the trial date, but just in terms of the -- the vast

14  amounts that are coming, sort of, randomly, when the Court may

15  set a date to, kind of, have all that complete.

16      THE COURT:  I understand the concern.  I'm not going

17  to do that today, but the time -- the time is probably

18  approaching where we need to do something.

19      MS. TOPLIN:  Thank you.

20      And, Your Honor, previously I think you asked whether

21  Mr. Quaglin should be present at the status of counsel hearing.

22  I think it's Mr. Sills, and -- and I do believe -- maybe it's

23  not my place to -- to raise this, but in speaking with

24  Mr. Kiyonaga, we kind of both discussed the propriety of

25  actually having both defendants present at that hearing.  So I

1     just want to make sure that that -- I think both need to be

2     colloquied.

3                THE COURT:  Okay.  So I'll suggest -- well, actually,

4     your client is at D.C. jail; is that --

5                MS. TOPLIN:  My client is at D.C. jail, yes.

6                THE COURT:  Okay.  So, Ms. Chaclan, can you check?  I

7     was thinking Tuesday, October 26th at 11:00 a.m. for a Zoom

8     hearing.  Do we have to see if we can get a --

9                THE COURTROOM DEPUTY:  What was the date?

10               THE COURT:  October 26th.  Does that work for

11    government, while we're looking, Tuesday, October 26th,

12    11 a.m.?

13               MS. JACKSON:  Yes.  Yes, Your Honor.

14               THE COURT:  Okay.  Does that work for you, ma'am.

15               MS. TOPLIN:  Yeah, that's fine.

16               THE COURT:  Stick around.  This is very complicated.

17         Okay.  Why don't you suggest a date, Ms. Chaclan.

18    You've got my calendar there.  You know what -- let's do this

19    off-line.  So I want to set a date --

20               MS. TOPLIN:  Okay.

21               THE COURT:  -- for the ascertainment of counsel.

22               MS. TOPLIN:  Great.

23               THE COURT:  And we need to have Mr. Sills and

24    Mr. Morss and the attorneys and government.

25         So, Ms. Chaclan, can I just ask you to follow up on

1    that.  Thanks.

2              MS. TOPLIN:  Thank you, Your Honor.

3              THE COURT:  Okay.  Thank you, ma'am.

4         All right.  Mr. Ohm.

5              MR. OHM:  Thank you, Your Honor.

6         On behalf of Mr. Mehaffie, we do not object to exclusion

7    of time under the Speedy Trial Act for the next 60 days.

8              THE COURT:  Okay.  The government has an outstanding

9    motion for a protective order.  Defense -- and I know this was

10   not you -- was supposed to respond by September 21st.  I take

11   it you have no objection to the protective order?

12             MR. OHM:  Your Honor, I -- I -- I guess I could just

13   acknowledge that if there hasn't been a response filed by

14   December -- September 21st, then there hasn't been an objection

15   lodged yet.

16             THE COURT:  Okay.  I'm going to grant the

17   government's motion for a protective order as to Defendants

18   Mehaffie, Cappuccio, and Klein.  I understand Mr. Cappuccio has

19   consented, and Mr. Klein consented in an earlier case.

20        Mr. Ohm, anything else that we should chat about as to

21   Mr. Mehaffie?

22             MR. OHM:  Your Honor, I don't know if the Court

23   needs -- we -- we joined in the government's recommendation

24   that Mr. Mehaffie just be admonished for the violation alleged.

25   I don't know if the Court wants to hear from me further.

1          THE COURT:  Okay.  So, frankly, I'm considering home

2     detention.  I'll hear why that's not appropriate.

3          MR. OHM:  Sure.  Your Honor, the -- I think primarily

4     that -- well, although this is sort of cast as tampering, there

5     is no evidence of tampering.  In fact, when Mr. Mehaffie was

6     directed to go to pretrial in Alabama, he did so immediately.

7     And when the probation office there inspected the device, they

8     recognized that there was no evidence of tampering, and I think

9     if you actually look at the -- Your Honor looks at the words

10    that were used --

11         THE COURT:  Yeah, I agree.  I don't think -- what I

12    understand is he went in the water when he was told not to and

13    therefore --

14         MR. OHM:  Well, so what he was told was to stay away

15    from the water.  What he understood was don't get the device

16    wet, which I think is a very reasonable understanding of that.

17    And so he -- he wasn't -- he didn't understand that because

18    obviously it wouldn't be necessarily reasonable to say that

19    there's anything about water that would affect his pretrial

20    detention status, whether it be listening to orders or

21    dangerousness or risk of flight.

22         He understood it to mean that if you get this thing wet,

23    then it's going to break.  So don't get wet.  And so that's --

24    that's what he did, and, unfortunately, what happened happened.

25         I want to just say for the record, Mr. Mehaffie

1   vehemently denies that on September 23rd that he went into the

2   water again.  And I actually think that the information in the

3   report corroborates that.  It says that -- it points from the

4   shoreline leading into the water.  And I know the Court knows

5   that GPS isn't like a -- it's not direct.  It has about a 40-

6   to 50-foot radius.  And I think very specifically, the pretrial

7   worker is saying -- the pretrial officer is saying that he

8   wasn't -- it didn't show him in the water.  It showed him going

9   towards the water.

10       And Mr. Mehaffie represents -- and he -- he feels very

11  bad about the fact that the -- the -- the machine had issues,

12  but he did not go into the water after he was told not to go

13  into the water.

14       I think the rest of his compliance history shows he

15  knows how to listen to the Court's orders.  He -- again, he

16  went right to -- right to Alabama pretrial when he was told to.

17  And he hasn't had any compliance issues in the past throughout

18  his supervision.

19       So those are the primary reasons, Your Honor.  I think

20  on the other side of it, Mr. Mehaffie is -- he's a carpenter,

21  and he also takes care of his 85-year-old mother who suffers

22  from dementia and lives about 40 minutes away.  You know, he

23  primarily -- his -- his -- the conditions would simply just be,

24  I think, prohibiting him from doing that, prohibiting him from

25  working as a carpenter, prohibiting him from going to church

1    and driving his grandkids around to various extracurricular

2    activity.  That's his life.  It's not like the GPS shows that

3    he's doing something particularly fun beyond what his

4    obligations are.

5        So I think for all those reasons, Your Honor, and also

6    because, in -- in my view, the -- the admonition from the Court

7    would be significant to Mr. Mehaffie.  He already feels very

8    badly about the fact that he is having to address the

9    condition -- or an alleged violation.  But we can assure the

10   Court that he would be more mindful, more respectful, and more

11   liberal and also ask follow-up questions when he is in

12   certain -- so something like this couldn't happen again.

13       But given the record, Your Honor, it doesn't -- it seems

14   that he does not -- he has not actually violated any

15   conditions.  He has not actually willfully tried to disobey

16   anything that his pretrial officer directed him to do.  And so

17   I'd ask the Court to leave him on his conditions of release.

18           THE COURT:  Thank you, Mr. Ohm.

19       Does pretrial services wish to be heard?

20           THE PRETRIAL SERVICES OFFICER:  Your Honor, first, to

21   clarify, that there are different types of tampering.  So we

22   look at -- when someone initially goes in for tampering, we

23   look at if there's any screwdriver marks around the device or

24   any marks that look like scissors were trying to cut the device

25   off.  I just wanted to clarify.

1          THE COURT:  And you're not alleging that; right?

2          THE PRETRIAL SERVICES OFFICER:  No, we're not

3     alleging that.  We're alleging -- we're saying that he went in

4     the water.  I'm not sure if Your Honor received the photos that

5     I sent --

6          THE COURT:  Yes.

7          THE PRETRIAL SERVICES OFFICER:  -- to chambers.  I

8     don't know if Mr. Ohm received them from defense counsel.  I

9     have them if he wants to look at them.

10         So it looks like, Your Honor, from the pictures on

11    September the 20th and September 22nd is when he went into the

12    water.  There's also an email exchange between him and the

13    courtesy supervision officer where he admits to being on a

14    floaty with his granddaughter, he tried to wrap it in plastic,

15    and she advised him that she told him before the trip.

16         I understand if Your Honor -- pretrial's policy is when

17    anyone tampers with the device, we ask for removal.  If

18    Your Honor is not inclined to remove him, then Your Honor

19    mentioned some type of home detention.  We would concur with

20    that for a certain amount of time, if Your Honor wants to use

21    that as a sanction.

22         THE COURT:  All right.  Thank you, ma'am.

23         Mr. Mehaffie, could you rise, please.  Sir, I'm

24    directing you to stay away from water.  Do not -- no more

25    floaties, no more going in the ocean.  One and only chance

1   here; okay?

2          DEFENDANT MEHAFFIE:  Yes.

3          THE COURT:  Don't come back with any more --

4          DEFENDANT MEHAFFIE:  Yes, sir.

5          THE COURT:  -- compliance issues.

6       All right.  Ms. Douenat -- Douenat.  Sorry.

7          MS. DOUENAT:  Good afternoon, Your Honor.

8       On behalf of Mr. Cappuccio, we do not object to the

9   60-day continuance, and we do agree that the speedy trial -- it

10  tolls the speedy trial deadline, especially because we've only

11  been on the case for a little over a month and two weeks.  So

12  it's -- now that the judge has granted the protective order, we

13  might be able to get through some of the evidence.

14      My only concern would be the fact that the government

15  mentioned extending the plea deadline only for 60 days until

16  the next status conference.  I still feel like by then, I may

17  not have been able to get through all the evidence that a lot

18  of the counsel has already -- other counsel on this case have

19  already been able to go through.  So -- so I'm not sure -- I

20  mean, I need to be able to do my due diligence before I can

21  advise my client on what to do, and I'm hoping that by then, I

22  would have -- would have been able to go through a lot of it,

23  but I don't know if that's enough.

24          THE COURT:  Okay.

25          MS. DOUENAT:  That's my only concern on that.  I

1    wanted to state it on the record on that issue.

2        On another issue --

3        THE COURT:  Let me say for that, ma'am, obviously I'm

4    not going to get involved in plea negotiations with the

5    government.  It does strikes me that, you know, it's pretty

6    common for the government to give early plea offers that would

7    expire before the defendant would get an opportunity to see all

8    of the discovery, sometimes even any discovery.  And your

9    client is in the best position to know what -- what he did and

10   didn't do and how he wants to handle it.

11       So I certainly understand the -- the difficulty that you

12   face, and I'm not going to -- I'm not setting any deadlines

13   obviously on pleas.  That's not up to me, but I think you can

14   certainly start talking with your client about how he wants to

15   proceed in this.

16       MS. DOUENAT:  And I'll discuss with -- with the

17   government as well.

18       THE COURT:  Right.

19       MS. DOUENAT:  I mean, I know that this was just -- I

20   mean, they just stated this, and it could just mean on behalf

21   of other clients.  Who knows.  But I will be addressing that

22   with the government.  I'm not trying to make the Court be

23   involved in plea negotiations.

24       I do want to address one issue that was brought to my

25   attention by my client yesterday.  He is also indigent.  He was

1    appointed court-appointed counsel.  So he had to fly here.

2    He and his wife scheduled -- made flight arrangements.  And

3    when they showed up at the airport, TSA had him on a list.  He

4    had -- he missed his flight.  They had to reschedule him on

5    another flight that went through -- it caused multiple

6    problems.

7         The first problem they caused was that they rerouted him

8    through -- through Chicago when his pretrial service officer

9    knew that he was going through Dallas.  So that alerted the

10   pretrial service officer.  They had to explain that they were

11   detained and they both had to be searched and their baggages

12   and luggages had to be searched.  And so it became a big ordeal

13   for them.

14        And -- and my concern would be that, you know, there

15   might be a future issue with -- with pretrial, even though I

16   think it was addressed at the time, on -- on a potential

17   violation, and I don't want that to be the case.  I know that

18   they sent an email to the pretrial service officer and talked

19   to the pretrial service officer about that change, as soon as

20   they called them and they said you're not in Dallas like you

21   said you would be.

22        My concern is I -- I'm not sure why he's on this TSA

23   list, but it -- it did cause a huge delay, and they were at the

24   airport far in advance of their flight; and, fortunately, they

25   scheduled it for early Sunday so they were able to get to D.C.

1      in the afternoon.

2                  THE COURT:  All right.  So are you asking me to do

3      something, ma'am, or are you just kind of raising this?

4                  MS. DOUENAT:  I don't know if the Court can do

5      something, as far as TSA is concerned, and I will file a

6      separate motion.  I just -- this was brought to my attention

7      today, and I just wanted to alert the Court.  I did alert the

8      government that that happened and how it was -- it was an

9      ordeal.

10                 THE COURT:  Yeah.  So as I said, I'm assuming your

11     client has no infractions, I'm fine with him waiving his

12     appearance for the subsequent status conferences.

13                 I have heard about this in other cases, and I'll just

14     say, I think it would be a very serious issue if the government

15     is somehow obstructing the defendants from appearing in court.

16     So I've -- I haven't had any briefing on this.  I'm certainly

17     not going to order anything, but I think if the government is

18     going to start preventing defendants on pretrial release from

19     coming to court, they're going to have problems.  So I'm

20     hopeful that you will not face that in the future.

21                 MS. DOUENAT:  Thank you, Your Honor.

22                 And as -- as of Friday, my understanding is that he was

23     compliant with all his pretrial service release conditions that

24     was filed with -- with the Court on Friday from the pretrial

25     service officer in San Antonio.

1          So thank you.  And, yes, we will be waiving our next

2     status conference.

3              THE COURT:  Okay.

4              MS. DOUENAT:  Thank you.

5              THE COURT:  Thank you.  Mr. Woodward.

6              MR. WOODWARD:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon, sir.

8              MR. WOODWARD:  Assuming that Mr. Klein remains on

9     release, we do not object to the government's request for a

10    60-day status hearing and waiving of the Speedy Trial Act

11    within that period.

12         I'd like to address the government's characterization of

13    the pretrial violation report that was filed.  We respectfully

14    disagree.  Not the government, nor the Court, is privy to the

15    communications that have been exchanged between Mr. Klein and

16    his pretrial officer.  And as an officer of the court, I will

17    represent that there is an obvious level of contempt

18    demonstrated by Mr. Klein's pretrial officer in these

19    communications.

20         In our view, it is not a coincidence that pretrial and

21    the government have twice previously requested that Mr. Klein's

22    conditions of release be modified.  Twice Judge Bates denied

23    those requests, and now we find ourselves here in your

24    courtroom.  Certainly the government has discretion on how it

25    proceeds in superseding its indictments, but the timing of that

1     is -- is incredibly coincidental.

2          The, quote/unquote, violation that pretrial has most

3     recently informed the Court of involves Mr. Klein declining to

4     respond to questions about his release, instead asserting his

5     Fifth Amendment rights, and what the report admits is he was

6     doing that on the advice of counsel.

7          I have repeatedly reached out to the pretrial officer in

8     this -- in this case.  I don't -- she does not respond to me.

9     This incident involving his meeting with me first required that

10    I confirm with the pretrial officer that, in fact, I was

11    inviting Mr. Klein to an attorney-client meeting.  When we

12    concluded that meeting, I reached out to his pretrial officer

13    to advise that he would be late because on a good day he was

14    30 minutes away from home.  And on that day, there was a

15    torrential downpour and he was returning in traffic.  She did

16    not respond.  She did not advise me that Mr. Klein needed to

17    contact her.  Instead, minutes after he walked in the door, she

18    wrote him and said that my communicating with her is not

19    sufficient.

20         It's -- Mr. Klein has the utmost respect for pretrial

21    services and the conditions that the Court has placed on his

22    release.  And the so-called violations with which he has been

23    accused of, you know, each time we have a court hearing,

24    there's something else that they are saying he didn't do, when

25    he is doing the best he can to comply with the allegations of

 1    his release.

 2         Again, I respectfully disagree with the government's

 3    characterization that he got drunk with his mother.  That's not

 4    what happened, and the email correspondence that was submitted

 5    with our prior filing in this issue reveals that what happened

 6    was that he reached out to his pretrial officer, advised her

 7    that he had been drinking over lunch with his mother, and they

 8    didn't that feel it was appropriate for him to drive himself.

 9         She granted an extension of his time out.  He wasn't in

10    violation of -- of his release.  If she had said no, that's not

11    acceptable, get in an Uber, he would have done that.  Instead

12    she said, okay, be home by what time, and he told her, and he

13    was home by -- by a time certain.

14         When he was taken for a urinalysis by a friend, he

15    didn't realize that the friend was going to make stops.  His

16    car was in the shop, which the pretrial officer was also aware

17    of.  He gets in the car with his friend who tells him that

18    there are several stops that she needs to make.  And his

19    concern is getting to the urinalysis and back.  He explained

20    all of that to the pretrial officer and apologized profusely in

21    correspondence that is not shared with the Court for its

22    review.

23         However, we would welcome the opportunity to brief the

24    Court on this issue, because when the Court, we submit, reviews

25    all of the correspondence as between Mr. Klein and his pretrial

1    officer, you will see there's a lot more going on here as well.

2    For example, he's been declined simple requests like going for

3    an outdoor jog.  He's been declined requests to go to church

4    functions, which are religious services explicitly authorized

5    by pretrial release conditions.  And yet his pretrial officer,

6    she will not approve these because they're, quote/unquote,

7    social activities.

8         He has been declined requests to spend time with his

9    family.  Following the incident at his mother's house, he made

10   a request to again visit with his mother in which he arranged

11   for transportation within time certain.  Declined because it is

12   a, quote/unquote, social activity.

13        He -- he's been declined requests to go to Total Wine

14   with no justification whatsoever.  He's been declined requests

15   to -- he made a request, rather, to run errands in a three-hour

16   window in which he specifically delineated the addresses where

17   he would be stopping, and the response was:  Approved, but you

18   may only have two hours.

19        So the back and forth as between his officer and -- and

20   himself reveals that, for whatever reason, there's a -- a level

21   of contempt harboring against Mr. Klein.  And he is doing

22   everything he can to demonstrate his compliance with the

23   Court's pretrial conditions and should not be punished as a

24   result of that.  I would note that when Mr. Klein was released,

25   as -- as the officer here today indicated, there were a number

1    of -- there's a backlog.  He -- after his release he spent

2    24 days out -- out of custody with no GPS monitoring.

3         What the government doesn't tell you is that they don't

4    suggest they did anything during that period in violation of

5    his -- of his pretrial order.  Released without GPS.  I mean,

6    surely if there was any time within which he was going to do

7    something, something dangerous, as the government would

8    suggest, that -- that's when it would have happened.

9         And yet as I stand before you today, neither pretrial

10   nor the government suggest that Mr. Klein presents any

11   articulable threat to the community as -- as a whole or to a

12   specific individually, and that is the standard that the Bail

13   Reform Act requires this Court to consider.  So, respectfully,

14   we don't believe that there needs to be any change.  In fact,

15   we're inclined to file a motion with the Court asking that he

16   be removed from GPS monitoring because it's clear that there's

17   a breakdown in communication or -- or ability to work together

18   as between his pretrial officer and himself.

19        THE COURT:  Okay.  Anything else you wish to address,

20   sir?

21        MR. WOODWARD:  I don't think so, Your Honor.

22        THE COURT:  Thank you.

23        I'll hear from pretrial services.

24        THE PRETRIAL SERVICES OFFICER:  Your Honor, this case

25   is supervised by Christine Schuck, who has been in

1    communication with the supervising officer in the Eastern

2    District of Virginia.  So I cannot comment on the defense

3    counsel's comments that there's a level of contempt in

4    reference to his client.  What I can comment on are basic

5    conditions of release.

6          And the first being, we do not -- in the D.C. area or

7    any other jurisdiction -- grant individuals approval when

8    they're on home confinement to go for a jog, because that's not

9    part of what they can do when they're on home confinement.

10          In reference to the errands, when someone calls and they

11   tell us where they want to go, we usually look at how far it is

12   away from their house, how many stops.  If it's, you know,

13   getting a haircut, we know that that might be awhile.  So we

14   calculate the time by that.  So if he asked for three hours and

15   she only gave him two, that's common practice.  I do that as

16   well for defendants.

17          In reference to -- and I will just note that on page 2

18   of the report, it says on Saturday, May 29th, the defendant

19   became intoxicated at his mother's residence and was unable to

20   arrive home until about 9:00 p.m., six hours past his original

21   authorized time.

22          I did not hear the AUSA say he got drunk with his

23   mother, but pretrial's report clearly states he was consuming

24   alcohol while at his mother's house which prevented him from

25   abiding by his set curfew and returned late, and that is

1    considered a violation.

2          And I will note that the beeping that Your Honor has

3    been hearing throughout the session is because the defendant's

4    battery is dying.  So unless he has a charger with him, which I

5    hope he does at his hotel room or in his car, his battery --

6    the -- the chargers usually start beeping when the battery is

7    at 30 percent, and then it beeps again at 20 percent, and so

8    on, when the battery is dying.  So the beeping Your Honor is

9    hearing is the battery has not been charged properly.

10          All of the other information is in the report,

11   Your Honor.  I'm sure you've read it.  I won't go over it.  I

12   will just highlight that during the office visit -- looks like

13   it was on August the 11th -- the defendant -- is when the

14   defense counsel said he invoked his Fifth Amendment rights not

15   to cooperate with the pretrial officer and answer any questions

16   that he was being asked.

17          THE COURT:  All right.  Thank you, ma'am.

18          Ms. Bond, are you handling this?

19          MS. BOND:  I am, Your Honor.

20          THE COURT:  So I think what we should do, if you want

21   to pursue this, is to file a motion.  And sounds like you

22   probably need a witness to -- sounds like some of these facts

23   are contested.  So I guess I'm inclined to put the defendant on

24   the release conditions in the other case; put them on here, and

25   then leave it to you if you want to pursue this further.

1          MS. BOND:  Thank you, Your Honor.  Will do.

2          THE COURT:  So, Mr. Klein, if you can stand, please.

3          Sir, I'm going to be ordering you on release conditions

4     in this case identical to those that you are facing in -- or --

5     or are under in your prior case.  We'll have you sign something

6     here in a moment once we have a next court date.

7          So I am directing you to come to court on the next date.

8     You do not have the option to waive your presence.  And I can

9     only say if it does come to sentencing in this case -- and

10     perhaps it will not, but if it does, I certainly do take a

11     defendant's pretrial release conduct into account, and you're

12     kind of starting out behind the eight ball on this with me.

13          So regardless of whether or not the government decides

14     to file a motion to revoke, I just encourage you to make sure

15     you're scrupulously complying with the release conditions and,

16     you know, I -- I don't know this pretrial services -- or

17     probation officer, but it's -- it's your responsibility to make

18     it work, not that -- that officer's.

19          All right.  Thank you.  You may sit down.

20          MR. WOODWARD:  Judge, I think the first case remains

21     open.  This has not been dismissed by the government or

22     otherwise administratively closed by the Court.

23          THE COURT:  Okay.  Do you have a motion?

24          MS. BOND:  Your Honor, we don't have a motion at this

25     time.  We're asking -- we specifically would like to file a

1    motion to address that, Your Honor.

2           THE COURT:  I think you probably need to file

3    something.  And, frankly, it's from Judge Bates.  So I'm not

4    sure that I can do it anyway.  So I'll just ask you-all to --

5    to talk with him and -- I don't think I have that case;

6    correct?

7           MS. BOND:  Correct.  It is Judge Bates.

8           MR. WOODWARD:  It has been transferred.

9           THE COURT:  It has been transferred to me?  Okay.  So

10   I'll ask you to file a motion.

11          MS. BOND:  Thank you, Your Honor.

12          THE COURT:  Thanks.

13      All right.  I do think it's appropriate for us to come

14   back in about 60 days.  I know most defendants have agreed to

15   toll the speedy trial clock.  Those that have not, nonetheless,

16   I am going to toll the speedy trial clock.  I think this is

17   regardless what -- I think about other cases, this strikes me

18   as a complicated case with a number of defendants,

19   co-defendants, and a lot of moving parts that are going to

20   require the government, the Court, and the defendants'

21   attorneys time to get up to speed.

22      I think it is appropriate to -- to toll the speedy trial

23   clock, and I find that the interests of justice outweigh the

24   interests of the defendant and the public to the extent that it

25   makes sense to toll until the next status hearing.

1          What I'm going to propose is on December 10th at

2    2:00 p.m.  It would be in person, but I'm -- as I said, most

3    defendants can -- can waive their presence.  Please raise your

4    right hand if that time does not work for you.  2:00 p.m. on

5    December 10th.  Does not.

6          Oh, my goodness.  Did this work the very first time?

7          Okay.  Speak now or forever -- yes.

8          Am I correct that most defendants are going to want to

9    waive their presence?  So I think we can go back to our

10   courtroom.  Okay.  So we'll set this for a continued status

11   conference on December 10th at 2:00 p.m.

12         And as I said, I'm -- I'm tolling the speedy trial clock

13   until then.

14              MR. METCALF:  Your Honor, if I may be heard.  It's a

15   date that Mr. McBride is not going to be able to do on that

16   day.  Is there any chance that it can be either before --

17   before the 8th or to the following week?  I apologize.

18              THE COURT:  Okay.

19              MR. METCALF:  That afternoon is the only time during

20   that week that is -- that he is not available.  So that's why.

21              THE COURT:  How about the following Friday?  Friday,

22   December 17th at 2:00 p.m.  Raise your hand if that does not

23   work for you.  Going once.  Going twice.

24         Okay.  So we'll set for a pretrial -- I'm sorry --

25   status conference on Friday, December 17th at 2:00 p.m.

```
 1              I'll be looking to the government to help me with some,

 2       kind of, clear direction from where we're going there.

 3              Ms. Jackson, anything we should be discussing today?

 4              MS. JACKSON:  No, Your Honor.

 5              THE COURT:  All right.  Mr. Klein, step forward,

 6       please.

 7              THE COURTROOM DEPUTY:  If you can please raise your

 8       right hand.

 9              (Oath administered to Mr. Federico Klein.)

10              DEFENDANT KLEIN:  I do.

11              THE COURTROOM DEPUTY:  Thank you.

12              THE COURT:  And, Mr. Klein, come on over here.  We'll

13       need you to sign something.

14              All right.  Anybody think there are any issues that I

15       did not address today that I should have addressed?

16              Okay.  Thanks, folks.  See you in a couple months.

17              (Proceedings were concluded at 6:09 p.m.)

18

19

20

21

22

23

24

25
```

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 6th day of October, 2021.

10

11                    /s/ Nancy J. Meyer
                      Nancy J. Meyer
12                    Official Court Reporter
                      Registered Diplomate Reporter
13                    Certified Realtime Reporter
                      333 Constitution Avenue Northwest
14                    Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25